IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

**KRISTIN NICOLE WEAVER,**

    **Plaintiff,**

v.

**LOUDOUN COUNTY SCHOOL BOARD |         Case No:**
**LOUDOUN COUNTY PUBLIC SCHOOLS,**

**Serve:**
    **Eric D. Williams, Superintendent**
    **Administration Building**
    **21000 Education Court**
    **Ashburn, VA 20148**

    **Brenda Sheridan, School Board Chair**     **JURY TRIAL DEMAND**
    **Administration Building**
    **21000 Education Court**
    **Ashburn, VA 20148**

**LOUDOUN COUNTY JUVENILE DETENTION**
**CENTER | LOUDOUN COUNTY**

**Serve:**
    **Loudoun County Board of Supervisors**
     c/o Leo Rogers, County Attorney
    **1 Harrison Street, SE, 5th Floor**
    **Leesburg, Virginia 20175**

    **Defendants.**

## COMPLAINT

COMES NOW, Plaintiff Kristin Nicole Weaver (hereinafter, "Ms. Weaver" or "Plaintiff"), by counsel, and states as her Complaint against Defendant Loudoun County School Board | Loudoun County Public Schools (hereinafter, "LCSB" or "LCPS"), and Defendant Loudoun County Juvenile Detention Center | Loudoun County (hereinafter, "the County") the following:

1

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter as it arises from the federal questions presented by the Family and Medical Leave Act, as codified under Title 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA"). *See generally* 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(4).

2. Venue is appropriate as the acts and/or omissions of Defendants from which the causes of action arise, occurred within the Eastern District of Virginia, specifically, Loudoun County. *See* 28 U.S.C. § 1391(b)(2).

3. Due to their contacts within the Commonwealth of Virginia, Defendants avail themselves to the jurisdiction of this Court.

4. As it relates to Plaintiff's ADA claims, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around February 12, 2020. Plaintiff received a Dismissal and Notice of Rights from the EEOC dated August 25, 2020, attached hereto as **EXHIBIT A**. Plaintiff files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

## II. FACTUAL ALLEGATIONS

5. Ms. Weaver, at all times relevant, was a resident of Frederick, Maryland, and was hired by LCSB in August of 2005.

6. Ms. Weaver worked on a consistent, full time basis for LCSB for more than fourteen (14) years and exhibited excellent work performance throughout her employment.

7. Indeed, Ms. Weaver was a model employee, and truly enjoyed her work supporting students, teachers, and administrators during her more than twenty (20)

years as an educator. Ms. Weaver is a National Board-Certified teacher, a Northern Virginia Community College dual enrollment instructor, and was recently selected as a Loudoun 100 honoree for her teaching.

8. Ms. Weaver taught English at Stone Bridge High School, a Loudoun County public school, for eight (8) years.

## LCSB & JDC Are Joint Employers

9. In July of 2013, Ms. Weaver began a new position working eleven (11) months per year, teaching eight (8) hour days at the Loudoun County Juvenile Detention Center ("the JDC") which is administered and run by the County. Though Ms. Weaver worked at the JDC, she was paid by LCSB. Upon information and belief, the County and LCSB worked "hand-in-hand" regarding the work of Ms. Weaver. Accordingly, both Defendants are considered joint employers of Ms. Weaver.

10. Defendants shared the following non-exhaustive roles and responsibilities regarding the employment of Ms. Weaver:

   a. Both Defendants had authority to provide daily directives and supervision of Ms. Weaver.

   b. Both Defendants weighed and reviewed Ms. Weaver's work performance.

   c. Both Defendants provided materials and various equipment, objects, and implements to Ms. Weaver for her to work. All new purchases for materials used by Ms. Weaver were approved by LCSB.

   d. Both Defendants maintained employment and personnel records of Ms. Weaver.

   e. Ms. Weaver had access to both LCSB property and the property of the JDC to perform her work.

    f.   Both Defendants shared the administration and execution of various periods of leave including leave pursuant to the FMLA.

### Weaver 2018 Health Crisis

11.    In August of 2018, Ms. Weaver unfortunately suffered an extreme health crisis. Due to symptoms stemming from undiagnosed Type 1 Diabetes, Ms. Weaver experienced the debilitations of sepsis.

12.    Ms. Weaver thereafter required emergent and extensive medical care, including a stay in the intensive care unit, and was at considerable risk for organ failure and/or death.

13.    In September of 2018, Ms. Weaver's health care provider submitted documentation to LCSB requesting continuous and intermittent leave for Ms. Weaver, pursuant to the Family and Medical Leave Act, as codified under Title 29 U.S.C. §§ 2601 *et seq*. ("FMLA").

14.    From Ms. Weaver's perspective at the time, LCSB seemingly granted Ms. Weaver continuous leave from August 15, 2018 through September 14, 2018.

### Weaver Improperly Denied Intermittent FMLA Leave

15.    However, both Defendants improperly interfered with Ms. Weaver's FMLA leave request by denying Ms. Weaver the ability to utilize intermittent FMLA leave upon returning to work. Ms. Weaver did not receive clear information from LCSB or the County regarding her submitted FMLA paperwork concerning her intermittent leave.

16.    Ms. Weaver returned to work in September of 2018. Ms. Weaver excelled at her job despite the fact that her serious health condition left her with disabilities that affected daily life activities such as eating, drinking, working, ambulating, focusing, sleeping, and it has affected her vision.

17.     In March of 2019, Ms. Weaver received a work performance evaluation endorsed by Administrator Peggy Gordon.  At all times relevant, Ms. Gordon acted in a supervisory capacity to Ms. Weaver, giving Ms. Weaver specific instructions/direction and providing work performance feedback.  The evaluation reflected very highly on Ms. Weaver's work performance and made no mention of issues regarding her attendance or FMLA leave.  Her "overall evaluation summary" provided that Ms. Weaver was "an outstanding teacher here at the detention center" and stated that Ms. Weaver would remain in her position during the 2019-2020 academic year.

### Retaliation for Use of FMLA Leave (a "Big Inconvenience")

18.     At the end of April 2019, Ms. Weaver was forced to miss work for two (2) days due to sudden illness associated with her diabetes.

19.     Upon Ms. Weaver's return to work on May 1, 2019, Ms. Gordon requested a meeting with Ms. Weaver.  Ms. Weaver complied.  During the meeting, Ms. Gordon adopted a very serious and punitive tone.  Ms. Gordon explained that she had recently reviewed the FMLA paperwork that had been submitted on behalf of Ms. Weaver months earlier in September of 2018, and angrily confronted Ms. Weaver, claiming that she [Ms. Gordon] had only just now seen the documents concerning Ms. Weaver's request for continuous and intermittent leave.[1]

20.     Ms. Gordon stated, on two occasions, that Ms. Weaver's leave was a "big inconvenience."

---

[1] It is the position of Ms. Weaver that Ms. Gordon had no authority or legitimate reason to review the details of Ms. Weaver's FMLA paperwork.  Such a review violated internal school policy and resulted in a violation of privacy.

21. Ms. Gordon further expressed that there were "issues" and "problems" with Ms. Weaver's FMLA request, and informed Ms. Weaver that she was no longer covered under intermittent FMLA leave.

22. Ms. Weaver requested clarification as to the "issues" or "problems" with the FMLA request as it was her understanding that her physician had timely submitted the necessary and accurate intermittent leave paperwork to LCSB.

23. Ms. Gordon responded that Ms. Weaver's use of leave was such a problem that Ms. Gordon could no longer approve any unpaid leave for Ms. Weaver.

24. Upon additional questioning by Ms. Weaver, Ms. Gordon admitted to Ms. Weaver that Ms. Gordon had contacted LCSB administrative personnel regarding Ms. Weaver's leave and to "check on [Ms. Weaver's] benefits".

25. Given Ms. Gordon's angry tone, Ms. Weaver asked Ms. Gordon if she was planning on firing her. Ms. Gordon responded, "Kristin, I don't think I could fire you right now if I wanted to."

26. At the conclusion of the meeting, Ms. Gordon directed Ms. Weaver to contact LCSB employee Shari Edwards regarding Ms. Weaver's FMLA leave.

27. Ms. Weaver complied and immediately contacted Ms. Edwards that same day. Ms. Edwards requested additional information to properly process and "backdate" Ms. Weaver's FMLA requests to March 1, 2019.

28. Ms. Edwards also stated to Ms. Weaver that Ms. Gordon had contacted her [Ms. Edwards], and indicated to Ms. Edwards that she [Ms. Gordon] was concerned about the status of Ms. Weaver's benefits.

29. Ms. Edwards also advised Ms. Weaver that she [Ms. Edwards] would no longer be employed by LCPS after May 17, 2019, because she was moving out of state. She urged Ms. Weaver to submit the revised FMLA documentation prior to that time.

30. On May 2, 2019, the teaching staff at the JDC participated in a team meeting overseen by Ms. Gordon. Ms. Gordon began the meeting by stating, "This is not going to be a good meeting." Ms. Gordon then reprimanded the entire staff for abusing medical leave. Ms. Gordon provided statistics on the days of leave that members of the teaching staff had used. Ms. Weaver felt singled out and ostracized among her peers as her serious health conditions and disabilities had required significant medical leave and her peers were aware of this.

31. Ms. Gordon then proceeded to discuss how there was a shortfall in the budget which necessitated a hiring freeze. The teachers - - who all worked via signed contracts with LCSB - - were informed that 2020 employment contracts were being held by the administration until decisions could be reached regarding the budget. Ms. Gordon stated that "no one will lose their teaching position in 2019 through 2020." Ms. Gordon promised further information in the weeks to come.

32. On that same date, Ms. Weaver emailed Ms. Gordon and requested clarification about the proper procedure to request medical leave in the future. Even though Ms. Gordon directed Ms. Weaver to contact Ms. Edwards with FMLA leave requests only the day before, Ms. Gordon responded that Ms. Weaver would still need to send leave requests directly to Ms. Gordon.

33. On May 2, 2019, Ms. Gordon requested a meeting with Ms. Weaver, and informed Ms. Weaver that she was considering issuing workplace discipline against Ms. Weaver for Ms. Weaver's use of medical leave.

34. Ms. Weaver was shocked and asked why Ms. Gordon had adopted such a punitive position on the subject, and why she acted aggressively. Ms. Gordon became highly agitated in this meeting and contended that she "could no longer protect" Ms. Weaver, and then demanded that Ms. Weaver take continuous, and not intermittent, FMLA leave. Ms. Weaver explained that she had made great strides with her health, and that intermittent leave was a more appropriate use of her substantive FMLA rights.

35. Also during this meeting, when Ms. Weaver professionally questioned Ms. Gordon's inaccurate understanding of LCSB leave policies and related FMLA protections, Ms. Gordon raised her voice in anger at Ms. Weaver, and yelled that "she does not get information from" LCSB, yelling, "Do you think people just send me policies or call me with policies?" Ms. Weaver countered that FMLA is a federal law, not an LCSB policy.

36. Ms. Gordon eventually apologized to Ms. Weaver for yelling at her during this meeting.

37. On May 9, 2019, Ms. Weaver emailed Ms. Gordon informing Ms. Gordon that she intended to submit her revised FMLA intermittent leave request paperwork to Ms. Edwards during her lunch break.

38. However, prior to her lunch break, at approximately 11:00 AM, Ms. Weaver was summoned to a meeting with Ms. Gordon and the JDC's Superintendent Michele Smith[2]. Ms. Weaver was informed by these individuals that she was being immediately dismissed from her current position and "no longer had a job". Ms. Weaver was advised that her work performance was not the issue; rather, Ms. Gordon advised Ms. Weaver

---

[2] Upon information and belief, Ms. Smith is not an employee of LCSB. Rather, she is an employee of Loudoun County.

that the eliminated position was due to the "budget" and that many other positions would be eliminated.

39. Upon information and belief, this decision was made intentionally so Ms. Weaver could not have her FMLA paperwork finalized in time.

40. After the meeting, Ms. Weaver, determined that she see her FMLA requests through, visited with Ms. Edwards to finalize approval of her intermittent FMLA request, which extended from March 1, 2019 through March 1, 2020.

41. Ms. Weaver submitted her original forms, slightly revised, which were immediately approved and backdated. Ms. Edwards explained that she was not sure that what LCSB/the JDC had done "was legal", and that since Ms. Weaver was protected by the FMLA, LCSB would have to find a replacement position.

42. Indeed, LCSB appeared to backtrack from the notification of a termination of employment to Ms. Weaver and, ultimately, informed her that her prior position had been eliminated and was a part of a "Reduction in Force" but that she would be transferred to another position.

43. Upon information and belief, the "Reduction in Force" was a sham and Ms. Weaver's position was the only one eliminated.

44. Ms. Weaver was ultimately given an "involuntary transfer" and placed into a ten (10) month teaching position as an English teacher at Douglass Alternative School, with a daily shift length of seven and one half (7.5) hours. This was a much less desirable position as Ms. Weaver earned $26,504.00 less annually in this position. Moreover, Ms. Weaver has suffered additional economic damages as the decrease in pay lowers her potential retirement benefits she may claim upon retirement. Regardless of how LCSB wishes to couch it, this was clearly an adverse employment action.

45. Ms. Weaver requested that her pay be protected but her requests were ignored. Ms. Weaver also requested the administration consider alternate placements for her, but Ms. Weaver was denied any changes to the position provided to her.

46. Upon information and belief, Ms. Weaver's transfer was not handled properly or in accordance with LCSB's or the JDC's protocols and procedures and was in direct retaliation for her use and attempted use of federally protected FMLA leave.

47. In addition, upon information and belief, Ms. Weaver's prior position was not truly eliminated, and Ms. Gordon took over that position and Ms. Weaver's job duties.

48. Of note, during her unwarranted and unlawful transition to her lower-paid position, Human Resources Director Christopher Bennett threatened Ms. Weaver by demanding that she sign her new employment contract or face the possibility of losing funding for her LCSB retirement plan. Upon information and belief, Mr. Bennett's threats were knowingly false, and made for the sole purpose of intimidating Ms. Weaver.

**Failure to Accommodate Weaver's Requested Accommodations**

49. Ms. Weaver's Type 1 Diabetes requires that she self-administer daily insulin via injections. LCSB failed to appropriately accommodate Ms. Weaver's disabilities, despite repeated requests.

50. Specifically, Ms. Weaver requested accommodations in the form of: 1. scheduled breaks (and possibly emergency breaks as needed) for treatment, testing, and medication dosing; 2. A private space for testing such as a restroom with running water, which was not available in her assigned school building; 3. The right to eat or drink in the classroom, as needed; 4. A slight accommodation to her work schedule to come to work one half hour earlier and leave one half hour earlier to help maintain her medication

schedule, giving her time to drive home before her stronger evening doses of insulin (of note, these requested times were not times when students were in the building).

51. Ms. Weaver initially requested these accommodations in an in-person meeting with Chris Bennett, Nicole Davis, and Christy Sullivan (LEA) on or around July 29, 2019.

52. Ms. Weaver contacted Jeanette Evans via telephone and requested these accommodations again on or around August 12, 2019. Ms. Weaver followed up, for a third time, with Ms. Evans via email on or around August 14, 2019. Ms. Weaver was denied accommodations by both Ms. Evans and her co-worker, Barbara Wooten. In lieu of granting accommodations, LCSB mailed Ms. Weaver a certified letter threatening her with termination, docked her pay, and took days away from Ms. Weaver's PTO leave balance.

53. Ms. Weaver specifically sought appropriate guidance from LCSB related to her disability needs and requested that they engage in the interaction process. However, LCSB, without legitimate reason, denied Ms. Weaver's requests, and later, denied Ms. Weaver a proper accommodation and refused to adequately engage in the interactive process. LCSB offered a frivolous accommodation of a "walkie talky" for Ms. Weaver to use. Ms. Weaver rejected this as the accommodation would not provide the assistance she needed, and she was concerned about broadcasting private health information to third parties.

54. Eventually, Ms. Weaver was provided with an alleged private space for testing and medication injections in her thighs and stomach as required. However, the space was not private at all, nor could it be made private for even small periods of time. Ms. Weaver experienced humiliating occasions of other employees walking into the space

while she was partially clothed and injecting insulin. Other employees had keys to this room, rendering the deadbolt on the inside of the door useless. When they opened the door, Ms. Weaver was also exposed to a hallway outside in a very busy area of the building. Indeed, Ms. Weaver injured herself by moving in fear and being startled during these interruption times. LCSB refused to address these issues in a timely manner.

55. At all relevant times, Defendants acted in concert with one another to violate Ms. Weaver's federally protected rights.

56. Ms. Weaver is still currently employed by LCSB.

### COUNT I: CLAIM FOR DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FMLA
### Against both Defendants LCSB and the County

57. Ms. Weaver incorporates herein by reference the preceding paragraphs of this Complaint.

58. LCSB and the County are: (1) engaged in commerce and/or in an industry affecting commerce; and (2) each is an employer of fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

59. Ms. Weaver worked for Defendants for more than 1,250 hours during the twelve (12) month period immediately preceding her adverse employment action (transfer and reduction in pay).

60. Ms. Weaver properly notified Defendants of her disabilities/serious health conditions, and of her need for FMLA-qualifying leave, to which she was entitled, to seek treatment for her disabilities/serious health conditions.

61. The Defendants discriminated against Ms. Weaver by improperly denying her federally protected FMLA rights, retaliating against her for attempting to exercise the

substantive FMLA rights to which she was entitled, and treating her differently, and less favorably, than similarly situated employees not exercising FMLA rights, resulting in adverse employment actions. In addition, Ms. Weaver was yelled at, threatened, and chastised due to her use and attempted use of federally protected FMLA leave.

62. Defendants would not have transferred Ms. Weaver, or taken other discriminatory and retaliatory actions against her, but for Ms. Weaver's requests related to, and use of, FMLA leave.

63. Any reasons given by Defendants for their treatment of Ms. Weaver were pretextual, as Ms. Weaver's work performance was excellent and the RIF was a sham.

64. The Defendants' discriminatory and retaliatory conduct prejudiced Ms. Weaver in that she lost compensation and benefits, sustained other monetary losses, and suffered an unnecessary transfer as a direct result of Defendants' violations.

65. As a direct and proximate result of Defendants' actions, Ms. Weaver has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

66. At all times material hereto, Defendants engaged in unlawful or discriminatory practices with bad faith, malice, or reckless indifference to the federally protected rights of Ms. Weaver so as to support an award of liquidated damages.

67. The above-described acts by Defendants and employees of both Defendants constitute unlawful discrimination and/or retaliation in violation of the Family Medical Leave Act, as codified under Title 29 of the United States Code §§ 2601 *et seq*. ("FMLA").

## COUNT II: CLAIM FOR INTERFERENCE WITH FMLA RIGHTS
**Against both Defendants LCSB and the County**

68. Ms. Weaver incorporates herein by reference the preceding paragraphs of this Complaint.

69. LCSB and the County are: (1) engaged in commerce and/or in an industry affecting commerce; and (2) each is an employer of fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

70. Ms. Weaver worked for Defendants for more than 1,250 hours during the twelve (12) month period immediately preceding her adverse employment action (transfer and reduction in pay).

71. Ms. Weaver properly notified Defendants of her disabilities/serious health conditions, and of her need for FMLA-qualifying leave, to which she was entitled, to seek treatment for her disabilities/serious health conditions.

72. Defendants interfered with Ms. Weaver's use of FMLA leave by refusing to properly process her FMLA paperwork, threatening her, treating her differently, and less favorably, than similarly situated employees not exercising FMLA rights and failing to properly accommodate Ms. Weaver's legitimate requests for intermittent FMLA leave, thus impeding Ms. Weaver's exercise of her FMLA rights, and ultimately resulting in adverse employment actions.

73. Defendant's interference prejudiced Ms. Weaver in that she lost compensation and benefits, sustained other monetary losses, and suffered an unnecessary transfer as a direct result of Defendants' violations.

74. As a direct and proximate result of Defendants' actions, Ms. Weaver has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

75. At all times material hereto, Defendants engaged in unlawful or discriminatory practices with bad faith, malice, or reckless indifference to the federally protected rights of Ms. Weaver so as to support an award of liquidated damages.

76. The above-described acts by Defendants and employees of the Defendants constitutes unlawful interference with Ms. Weaver's rights in violation of the Family Medical Leave Act, as codified under Title 29 of the United States Code §§ 2601 *et seq*. ("FMLA").

### COUNT III: CLAIM FOR DISCRIMINATION AND RETALIATION IN VIOLATION OF THE ADA
### Against Defendant LCSB Only

77. Ms. Weaver incorporates herein by reference the preceding paragraphs of this Complaint.

78. At all times relevant to this Complaint, Ms. Weaver was a qualified individual with a disability, pursuant to the ADA.

79. Specifically, and at all times relevant, Ms. Weaver suffered from the disability/serious health condition of Type I Diabetes, which impaired several of Ms. Weaver's daily life activities and/or functions.

80. In the alternative, Ms. Weaver was regarded by LCSB as having such an impairment.

81. At all times relevant, however, Ms. Weaver could perform the essential functions of her job as a teacher at LCSB with or without an accommodation.

82. Prior to her requests for accommodations, Ms. Weaver was performing her work at a satisfactory level and meeting or exceeding the legitimate business expectations of LCSB.

83. Ms. Weaver revealed her disability/serious health condition to her supervisors and co-workers at LCSB and requested reasonable accommodations to treat and manage the same.

84. LCSB discriminated and retaliated against Ms. Weaver by failing to engage in the interaction process and refusing to adequately accommodate Ms. Weaver.

85. LCSB would not have taken discriminatory and retaliatory actions against Ms. Weaver, but for Ms. Weaver's disability/serious health condition and/or requests for reasonable accommodations.

86. Any reasons given by LCSB for its treatment of Ms. Weaver were pretextual, as Ms. Weaver's work performance was excellent and she properly followed all policies and procedures.

87. As a direct and proximate result of LCSB's actions, Ms. Weaver has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

88. At all times material hereto, LCSB engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Ms. Weaver so as to support an award of punitive damages.

89. The above-described acts by LCSB and employees of LCSB constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

### COUNT IV: CLAIM FOR FAILURE
### TO ACCOMMODATE IN VIOLATION OF THE ADA
### Against Defendant LCSB Only

90. Ms. Weaver incorporates herein by reference the preceding paragraphs of this Complaint.

91. At all times relevant to this Complaint, Ms. Weaver was a qualified individual with a disability, pursuant to the ADA.

92. Specifically, and at all times relevant, Ms. Weaver suffered from the disability/serious health condition of Type I Diabetes, which impaired several of Ms. Weaver's daily life activities and/or functions.

93. In the alternative, Ms. Weaver was regarded by LCSB as having such an impairment.

94. At all times relevant, however, Ms. Weaver could perform the essential functions of her job as a teacher at LCSB with or without an accommodation.

95. Prior to her requests for accommodations, Ms. Weaver was performing her work at a satisfactory level and meeting or exceeding the legitimate business expectations of LCSB.

96. Ms. Weaver revealed her disability/serious health condition to her supervisors and co-workers at LCSB and requested reasonable accommodations to treat and manage the same.

97. LCSB discriminated and retaliated against Ms. Weaver by failing to engage in the interaction process and refusing to adequately accommodate Ms. Weaver.

98. LCSB would not have taken discriminatory and retaliatory actions against Ms. Weaver, but for Ms. Weaver's disability/serious health condition and/or requests for reasonable accommodations.

99. Any reasons given by LCSB for its treatment of Ms. Weaver were pretextual, as Ms. Weaver's work performance was excellent.

100. As a direct and proximate result of LCSB's actions, Ms. Weaver has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

101. At all times material hereto, LCSB engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Ms. Weaver so as to support an award of punitive damages.

102. The above-described acts by LCSB and employees of LCSB constitute failure to accommodate in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA").

WHEREFORE, Plaintiff Kristin Nicole Weaver prays for judgment against Defendant Loudoun County School Board and Defendant Loudon County Juvenile Detention Center | Loudoun County and for equitable relief, compensatory, liquidated and/or punitive damages, together with prejudgment interest from the date of Ms. Weaver's adverse employment actions, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,

**KRISTIN N. WEAVER**

<u>/s/ Thomas E. Strelka</u>
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB #92598)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA EMPLOYMENT LAW
119 Norfolk Avenue, S.W., Suite 330
Warehouse Row
Roanoke, VA  24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
brittany@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*